UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| IN RE THE MILLS CORPORATION ) <br> SECURITIES LITIGATION ) <br> ) <br> ) <br> THIS DOCUMENT RELATES TO: ) <br> 1:06-cv-0077 ) <br> 1:06-cv-0247 ) <br> 1:06-cv-0265 ) <br> 1:06-cv-0304 ) <br> 1:06-cv-1446 ) <br> 1:07-cv-0296 ) | Civil Action No. 1:06-cv-077 |

## **MEMORANDUM OPINION**

At issue is Lead Plaintiffs Iowa Public Employees' Retirement System[1] and Public Employees' Retirement System of Mississippi[2] (collectively, "Lead Plaintiffs")'s Motion for Class Certification. On February 26, 2009, the Court held a hearing on this motion. Upon consideration of the motion, and finding that Lead Plaintiffs have demonstrated the existence of the prerequisites for class certification articulated in Fed. R. Civ. P. 23(a) and 23(b)(3), the Court granted Plaintiffs' Motion for Class Certification on March 31, 2009, certifying two subclasses:

(1) As against Defendant Ernst & Young, all persons who purchased or otherwise acquired Mills common and preferred stock, during the period from March 28,

---

[1] IPERS is a pension fund with tens of billions of dollars in assets for the benefit of public employees in Iowa's schools, state agencies, counties, cities, and other public entities. During the class period, IPERS purchased approximately 172,927 shares of Mills stock.

[2] MPERS is a government defined-benefit plan for the benefit of public employees in Mississippi. It has tens of billions of dollars in assets, and during the class period purchased approximately 109,506 shares of Mills stock.

2002 through August 10, 2006, and who were damaged thereby;

(2) As against the KanAm Defendants[3], all persons who purchased or otherwise acquired Mills common and preferred stock, during the period from February 27, 2001 through August 10, 2006, and who were damaged thereby.

After the Court issued the class certification order, Defendant Ernst & Young reached settlement with Plaintiffs. Accordingly, this memorandum opinion will address class certification only with respect to the KanAm Defendants - the only remaining defendants in this case.[4]

I. **Background.**

This action arises from allegations of accounting fraud by the Mills Corporation and related entities, Mills' senior officers and directors, the KanAm defendants, and Mills' outside auditor Ernst & Young. Mills Corporation was a Real Estate Investment Trust (REIT) that owned and developed "shoppertainment" centers throughout the United States and Europe. Plaintiffs allege that Mills issued false financial statements for nearly six years. According to the complaint, Mills' public statements and SEC filings from 2000 to 2006 contained material

---

[3] The "KanAm Defendants" refers to the group of nine KanAm corporate entities, which were substituted into the case on February 9, 2009: KanAm International, KanAm Grund Kapitalanlagegescellschaft MBH, KanAm Services, Inc., KanAm Management, LLC, KanAm LLC, KanAm Providers, Inc., KanAm Realty, Inc., KanAm US, Inc., and KanAm America, Inc. The KanAm defendants filed an answer to the Second Amended Complaint on March 13, 2009, after the Court denied their motion to dismiss on March 3, 2009. They are the only defendants remaining in this case.

[4] The March 31, 2009 Order also certified the Iowa Public Employees' Retirement System and the Public Employees' Retirement System of Mississippi as Lead Plaintiffs in this action, appointed Plaintiffs C. Bickley Foster, Frederic Elliott, and Vernon E. Rudolph as representative plaintiffs for the Class, and – pursuant to Fed. R. Civ. P. 23(g) – appointed Barrack, Rodos & Bacine, and Bernstein Litowitz Berger & Grossmann LLP as Class Counsel.

misrepresentations and omissions. Ultimately, twenty-three consecutive quarters of Mills' financial statements – from 2000 to 2005 – had to be restated. These misstatements were significant – Mills overstated shareholders' equity by approximately $350 million, or 35%, and partners' capital by approximately $430 million, or 40%. Mills' net income for 2003, 2004, and 2005 was overstated by $210 million, or 158%. In each of these years, Mills met or exceeded analysts' earnings expectations. Fueled by false financials, Mills' stock price rose dramatically. From 2001 to the end of 2004, Mills common stock rose from $26 per share to more than $63 per share. Mills raised more than $1.4 billion in capital from public and private stock offerings between 2001 and 2006, and, through bonuses and sales of shares, Mills' officers and directors realized more than $90 million.

In late 2005, Mills began a series of public disclosures revealing that its financial statements needed to be restated. According to plaintiffs, the first partial disclosure occurred on November 1, 2005, followed by further partial disclosures on January 9, 2006, February 24, 2006, and March 20, 2006, and a final disclosure on August 10, 2006. The market's reactions to the 2006 disclosures varied. After the January 6, 2006 announcement, Mills common stock declined 2.8%. After the February 23, 2006 announcement, the common stock declined 3.6%. After the March 17 announcement, the common stock declined 12.5%. After the final disclosure on August 10, the common stock declined a precipitous 26.5%.

The Second Amended Consolidated Complaint asserts only two claims against the KanAm entities: one for control person liability under Section 20(a) of the Exchange Act, and another for a violation of Section 15 of the Securities Act. The complaint alleges that the KanAm Defendants controlled Mills, that KanAm owned 35% of the company after the IPO, and

that KanAm exerted control through Defendants von Boetticher, von Perfall, and Braithwaite, who represented KanAm on the Mills Board. Plaintiffs further allege that KanAm – as Mills' primary joint venture partner – participated in the preparation and dissemination of each of the annual statements containing false financials issued by Mills from 2000 to 2004, as well as the registration statements issued from 2000 to 2005.

## II. Standard of Review.

The party moving for class certification bears the burden of demonstrating that its proposed class meets the requirements of Rule 23 of the Federal Rules of Civil Procedure. *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 524, 538 (E.D. Va. 2006) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). First, the movant must satisfy the threshold requirements contained in Fed. R. Civ. P. 23(a), which include the following factors: (1) "numerosity" – that the class is so numerous that joinder of all members would be impracticable; (2) "commonality" – that questions of law or fact are common to the class; (3) "typicality" – that the claims or defenses of the representative party are typical of those of the class; and (4) "adequacy" – that the representative party fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a); *Lutz v. Int'l Assoc. of Machinists and Aerospace Workers*, 196 F.R.D. 447, 450 (E.D. Va. 2000). Next, the movant must demonstrate that the proposed class fits one of the three categories of actions identified in Rule 23(b). *See Lutz*, 196 F.R.D. at 450. As is the case with most securities fraud class actions, Lead Plaintiffs move under Rule 23(b)(3), contending that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that "a class action is superior to other available

4

methods for the fair and efficient adjudication of the controversy." *BearingPoint*, 196 F.R.D. at 450 (quoting Fed. R. Civ. P. 23(b)(3)).

District courts must conduct a "rigorous analysis" of the Rule 23 requirements of numerosity, typicality, commonality, and adequacy of representation. *General Telephone Co. v. Falcon*, 457 U.S. 147, 161 (1982). In *Gariety v. Grant Thornton*, the Fourth Circuit explained that courts must go beyond the face of the pleadings and make factual findings with respect to the Rule 23 factors. *See Gariety v. Grant Thornton*, 368 F.3d 356, 365-66 (4th Cir. 2004). *Gariety* did not specify what standard of proof applies to this factual inquiry. At least one district court in the Fourth Circuit has applied a preponderance standard. *See In re Safety-Kleen Corp. Bondholders Litigation*, 2004 WL 3115870, at *2 (D.S.C. 2004) ("*Gariety* does not address the standard of proof the court should use in making its findings in evaluating the propriety of class certification . . . Although there is a scarcity of cases on point, the existing authority suggests that the preponderance of the evidence standard should be applied."); *see also* McLaughlin on Class Actions, § 5:25 (2008).

The Court finds these authorities persuasive, and will apply the preponderance standard in this Rule 23 inquiry.

### III. Discussion.

### A. Plaintiffs Have Met Their Burden as to the Rule 23(a) Factors.

1. <u>Numerosity.</u>

The numerosity requirement is seldom disputed in securities fraud cases given the large quantity of shareholders who purchase stock in reliance upon a company's public statements.

5

*BearingPoint*, 232 F.R.D. at 538. The parties here do not dispute numerosity. Mills had millions of shares outstanding during the Class Period. *Id.* As it would be "impracticable to join such a large and geographically diverse group," the Court finds that the numerosity requirement is satisfied. *Id.*

### 2. Commonality and Typicality.

The Rule 23(a) requirements of commonality and typicality tend to merge analytically. In general, commonality requires that there be "questions of law or fact common to the class," and typicality requires that "the claims or defenses of representative parties are typical of the claims or defenses of the class." *BearingPoint*, 232 F.R.D. at 538 (citing *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)). This does not mean that members of the class must have "identical factual and legal claims in all respects." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998). Rather, "the interests of the party representing a class must be substantially similar to those of the unrepresented parties." *BearingPoint*, 232 F.R.D. at 538 (citing *Broussard*, 155 F.3d at 337). Thus, the analysis of typicality and commonality requires some modest evaluation of the "substantive legal issues likely to arise in the litigation of the merits." *BearingPoint*, 232 F.R.D. at 538. A defense that is unique to the class representative and has the potential to become "the focus of the litigation" may destroy typicality. *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990); *see also* 5 Moore's Federal Practice § 23.24[5] ("Typicality will not be present if the class representative's claim is subject to one or more unique defenses that likely will be central to the litigation. A unique defense that is central to the litigation precludes a finding of typicality because of the danger that the unique defense will

preoccupy the class representative to the detriment of the interests of absent class members.").

As mentioned above, the remaining claims in this action assert control person liability against the KanAm Defendants under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. Section 20(a) and Section 15 are "parallel provisions," which are "interpreted in the same manner." *In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 2990646, at *7 (S.D.N.Y. 2005). To prevail under either statute, "the plaintiff must allege (a) a primary violation by the controlled person, and (b) control by the defendant of the primary violator . . . To make out a claim under Section 20(a), but not Section 15, the plaintiff must also allege culpable participation in some meaningful sense by the controlling person in the fraud." *Global Crossing*, 2005 WL 2990646, at *7 (internal quotation marks and citations omitted).

In general, "[m]embers of a proposed class in a securities case are especially likely to share common claims and defenses." *BearingPoint*, 232 F.R.D. at 539. In this case, Plaintiffs will have to prove that Mills – as the "controlled" person – committed securities fraud, and that the KanAm Defendants controlled Mills to a culpable degree. Thus, Plaintiff Rudolph, Lead Plaintiffs, and the purported class of investors would have to prove the same set of facts, and the ultimate result at trial will depend upon whether Mills violated the securities laws, and whether the KanAm Defendants were control persons. As an initial matter, it seems that the interests of the Lead Plaintiffs and Representative Plaintiffs are aligned with those of the class.

Defendants challenge the end date of the class period, arguing that the class period should end on February 24, 2006, because Mills' disclosures on February 23, 2006, rendered continued reliance on the stock price unreasonable. Plaintiffs, of course, are entitled to the "fraud on the market" presumption of reliance. Under this theory, the court presumes that "an investor who

buys or sells stock at the price set by the market does so in reliance on the integrity of the market price." *Gariety*, 368 F.3d at 367 (quoting *Basic v. Levison*, 485 U.S. 224, 247 (1988)). If the link is severed by a showing that market analysts no longer consider the share price as reflecting value, then reliance can no longer be presumed and individual issues predominate over class issues. *BearingPoint*, 232 F.R.D. at 539-540. In an efficient market, the prices of actively traded securities are presumed to incorporate all publicly available information. *Id.* Thus, to be entitled to the presumption, Plaintiffs need only demonstrate that the company's shares traded in an efficient market. *Id.* The Fourth Circuit has explained that "to determine whether a security trades in an efficient market, a court should consider factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals." *Gariety*, 368 F.3d at 368 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989)) (examining (1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes).

Here, Plaintiffs have met their burden of showing that Mills stock traded in an efficient market throughout the class period ending on August 10, 2006. On February 23, 2006, Mills disclosed that the financial restatement would involve more accounting issues and have substantially greater impact than previously expected. But this press release was couched in terms of probability, *e.g.*, "additional adjustments *may be* identified," which "*could be* material, either individually or in the aggregate." Mills informed the market that it was withdrawing its 2005 earnings and FFO guidance and that those numbers would be significantly below market

expectations, but did not quantify the expected differences. These disclosures did not correct Mills' previous announcements that the restatement would only reduce net income from 2000 to 2005 by $25 million, nor did Mills provide hard numbers on the size of the restatement.

To be sure, after February 23, 2006, some industry analysts – including ones at Deutsche Bank, Merrill Lynch, and Key Banc – stopped trying to value Mills. But other analysts, including ones at Stifel Nicolaus, BofA, and Morgan Stanley, continued to value Mills throughout the class period ending August 10, 2006. Contrary to Defendants' assertion, then, there was no "consensus" among analysts that attempts to value Mills should be abandoned. In fact, several prominent analysts at Bank of America, Morgan Stanley, and Stifel Nicholas continued to recommend a "hold" on the stock. Other analysts even upgraded Mills stock to a "buy" in the months following February 2006.

Moreover, the price movement of Mills stock supports an inference that the market continued to rely on Mills' financial statements through August 10, 2006. After the February 23, 2006 disclosures, Mills common stock fell only $1.48, or 3.66%, from $41.13/share to $39.65/share, and remained in the $39-$40 range in the weeks following the announcement. By contrast, after the August 10, 2006 disclosures, Mills common stock fell from $21.63 (close of August 10) to $15.91 (close of August 11), a 26.5% drop, and prices of all Mills preferred stock declined between 7.3% and 9.8%. In *BearingPoint* the market reacted "quite modestly" to the company's early disclosures of weakness in internal controls and financial restatements, from which the Court inferred that the market "continued to rely" on the erroneous financial statements. 232 F.R.D. at 540, 542-43. Similarly here, the relatively modest reaction to Mills' disclosures prior to August 10, 2006, indicates that the artificial inflation in the price was not

purged by these disclosures.

Moreover, at the class certification stage courts generally do not close a class period on the basis of one disclosure when a subsequent disclosure caused a significant drop in stock price. The reason is that such cases present factual issues as to whether early disclosures were fully or partially curative. *See In re Scientific-Atlanta*, 571 F. Supp. 2d 1315, 1344 (N.D. Ga. 2007) (certifying broader class period because substantial factual question existed as to whether a particular disclosure "cured" the prior misrepresentation); *see also In re Kirschner Medical Corp. Sec. Litig.*, 139 F.R.D. 74, 82 (D. Md. 1991). Where parties dispute the curative effect of a disclosure, the court must determine whether there is a "substantial question of fact as to whether the release had cured the market or was itself misleading," *Kirschner*, 139 F.R.D. at 82, and if a substantial question exists the broader time for the class period should be certified. *In re Scientific-Atlanta*, 571 F. Supp. 2d at 1244-45.[5] Here, according to the allegations, Defendants participated in a fraud on the market that was not fully discovered until August 10, 2006. Given the market's modest reaction to the disclosures in 2005 and early 2006, and the large magnitude of the market reaction after August 10, 2006, the broader class period is appropriate. *Scientific-Atlanta*, 571 F. Supp. 2d at 1344; *LDK Solar*, 2009 WL 196396, at *8.

---

[5] For example, in *In re LDK Solar Sec. Litig.*, the court declined to close the class period after a disclosure caused the stock price to drop by 24%. 2009 WL 196396, at *8 (N.D. Cal. 2009). The defendant urged that this disclosure destroyed any reasonable reliance upon the stock price. Five days later, however, a magazine article described the allegations in greater detail and the stock price plunged another 26% in the next day's trading. The court certified a class period with the later date. "If some tentative or partial disclosure of fraud is published but the truth is not fully revealed, there would be no reason to assume that the market fully recovered from the impact of the misrepresentation or omission. Investors who purchased after such a disclosure may well have done so at a price still inflated by the same fraud (even if less so) and may suffer losses when the full details of the fraud are exposed." *Id.* This reasoning is applicable here.

Defendants also argue that the market for shares of Mills preferred stock was inefficient because these shares traded at a lower volume. The Court must reject this argument. Preferred shares generally trade at lower volumes because the investors tend to buy preferred stock for longer term investment due to the higher dividends. Further, in 2006 the trading volumes for Mills preferred shares increased between 2-3.5%, well above the 1% threshold in *Cammer*. A finding of market efficiency for the preferred shares is further supported by the considerable price drop in Mills preferred stock on August 11, 2006.

Defendants also argue that preferred shareholders who suffered no actual injury are subject to unique defenses and therefore are unable to represent the class.[6] As a preliminary matter, the Court must decide whether this issue is ripe for determination at the class certification stage. The Supreme Court has clarified that the "two traditional elements" of damages in a fraud case – economic loss and causation – must be proven for a successful securities fraud claim. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343-344 (2005) ("the common law has long insisted that a plaintiff in [a fraud case] show not only that had he known the truth he would

---

[6] If true, this would preclude two of the Representative Plaintiffs (Bickley Foster and Fredric Elliott), both of whom allegedly recovered at least their initial purchase price for all their Mills preferred shares. Plaintiffs assert that these class representatives paid an inflated purchase price higher than the closing price on August 11, 2006 (as well as higher than the 90-day average price thereafter). Plaintiffs concede that Rudolph and Foster continued to hold their Series E preferred stock after the last corrective disclosure on August 10, 2006, and therefore under Section 21D(e) of the PSLRA their damages were capped at the difference between their purchase price and the 90-day average price. Under this measure, Rudolph suffered damages of $4.75/share ($25.80 - $21.05) on his Series E stock and Foster suffered damages of $3.95 ($25.00 - $21.05) on his Series E stock.

Mills Series G stock closed at $19.00/share on August 11, 2006, and the 90-day average price thereafter was $19.97/share. Under a similar calculation, Elliott and Foster suffered a loss of $5.03/share on their purchases of Series G stock.

not have acted but also that he suffered actual economic loss").[7] The cases are split, however, on whether a plaintiff who purports to represent a class need show economic loss and loss causation at class certification. *See* 26A Securities Litigation Damages 24:3.10 ("whether *Dura* applies on motions for class certification, and whether plaintiffs must establish loss causation on such a motion still is in dispute").

The Fourth Circuit has not considered this issue. The Fifth Circuit holds that "loss causation must be established at the class certification stage by a preponderance of all admissible evidence," but can be reexamined at summary judgment. *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 268-269 (5th Cir. 2007). Several district courts have followed *Oscar*. *See, e.g., In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 2008 WL 512779, at *12 (S.D.N.Y. Feb. 26, 2008) (granting defendants' motion to decertify a class because of plaintiffs' failure to establish loss causation at class certification); *In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 401 (D. Mass. 2007).

Other district courts have disagreed because "[l]oss causation . . . is an issue related to the merits rather than to the Rule 23 inquiry into whether common issues will predominate." *In re Micron Technologies Inc. Sec. Litig.*, 247 F.R.D. 627, 634 (D. Idaho); *BearingPoint*, 232 F.R.D. at 543; *see also In re Cooper Companies Inc. Sec. Litig.*, 2009 WL 32568, at *11 (C.D. Cal. 2009) (same); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008) (at the class certification stage, court should not make a finding as to whether a plaintiff has established loss causation); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280-281 (S.D.N.Y. 2008) ("Loss

---

[7] To ultimately recover, a plaintiff must prove a loss and that the alleged misrepresentation was a "substantial cause" of the loss. *See Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 232 (4th Cir. 2004) (emphasis in original).

Causation, however, relates to the merits of Plaintiffs' case and Defendants have not sufficiently established how Loss Causation is related to any necessary element of Rule 23 . . . plaintiffs need only establish that they 'may be able to . . . prove loss causation' at trial"); *In re Tyco Int'l Ltd.*, 236 F.R.D. 62, 71 (D.N.H. 2006) (noting that "[d]isputes about loss causation turn primarily on questions of fact" and therefore should be resolved on summary judgment); *Ross v. Abercrombie & Fitch Co.*, 2008 WL 4059873, at *2 (S.D. Ohio 2008) ("'Loss causation' is not a factor listed in Rule 23. In a securities case, any issue relating to causation is an element of the plaintiff's cause of action . . . Ordinarily, the Court should not consider the merits of the case when deciding if a class should be certified.").[8]

In this Court's opinion, the latter cases have the stronger reasoning. Requiring a plaintiff to "prove" loss causation at class certification risks converting class certification into a hearing on the merits. *See LDK Solar*, 2009 WL 196396, at *12. In cases where the class hearing precedes discovery, this could require a court to rule on factual issues prior to meaningful discovery. In addition, Rule 23(a) – by its plain terms – does not require anything beyond a showing of numerosity, typicality and commonality, and adequacy. To be sure, loss causation

---

[8] In *LDK Solar*, the Northern District of California distinguished *Oscar* as follows:

> The breadth of the *Oscar* holding is striking. It essentially injects what is fundamentally a merits inquiry into the class certification inquiry through the back door: it requires the plaintiff to prove loss causation in order to avail itself of the benefit of the fraud-on-the-market presumption (without which certification is virtually impossible). This order declines to adopt *Oscar*'s loss-causation requirement for class-certification. *Oscar* placed the Fifth Circuit in a minority-indeed, apparently solitary-stance among the circuits; it is in no small amount of tension with the Supreme Court's decision in *Basic v. Levinson*.

> 2009 WL 196396, at *12.

could be grounds for summary judgment once the factual record is developed through discovery. But requiring a factual showing of loss causation at the class certification stage would be – to borrow a cliché – putting the cart before the horse.

In sum, the Court holds that Plaintiffs have satisfied the commonality and typicality requirements of Rule 23(a).

3. <u>Adequacy.</u>

To certify a class, Rule 23(a) requires a showing that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). To meet this requirement counsel must possess the qualifications and ability to litigate the case, and be free of interests hostile to those of the class. *Lutz*, 196 F.R.D. at 452. Defendants do not dispute the ability and resources of class counsel. Instead, they argue that Plaintiff Rudolph lacks basic knowledge about the nature of the class action and thus cannot serve as an adequate representative. Defendants submitted portions of Rudolph's deposition supposedly demonstrating his ignorance of basic facts of the litigation. The Court has reviewed these excerpts, and finds that Rudolph is sufficiently informed to serve as a class representative. "[I]n a complex lawsuit . . . the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003). A class representative is allowed to rely on counsel to keep him abreast of developments and make strategic decisions in a class action lawsuit. *Id.*

B.  **Plaintiffs Have Met Their Burden as to the Rule 23(b)(3) Factors.**

As a final step, Rule 23(b)(3) requires a showing that common issues predominate over questions affecting individual members, and that a class action "is superior to other available methods for the fair and efficient adjudication of the controversy." *BearingPoint*, 232 F.R.D. at 541 (quoting Fed. R. Civ. P. 23(b)(3)). The predominance inquiry focuses on liability issues, as "differences in damages among the potential class members do not generally defeat predominance if liability is common to the class." *Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 299 (E.D. Va. 2004). Securities fraud actions typically meet the Rule 23(b)(3) requirement because the claims relate to acts or omissions of the same defendants and damages of individual class members might be too small to provide incentive for the individuals to sue. *BearingPoint*, 232 F.R.D. at 542 (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). This case involves predominant common issues for the reasons explained in the discussion of commonality and typicality. The Court further finds that the class method is superior to other methods of resolving the controversy. Fed. R. Civ. P. 23(b)(3).

IV.  **Conclusion.**

The Court affirms its certification of a class as against the KanAm Defendants consisting of all persons who purchased or otherwise acquired Mills common and preferred stock during the period from February 27, 2001 through August 10, 2006, and who were damaged thereby. There being no objection raised by the parties, the Certification Order is hereby modified to exclude from the class defendants (and their officers, directors, partners, and agents) and any persons who purchased and sold all of their Mills securities before close of the market on October 31, 2005.

`ENTERED on this 16th day of April, 2009.`

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

ENTERED on this 16th day of April, 2009.

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge