## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| IN RE THE MILLS CORPORATION | ) | |
| SECURITIES LITIGATION | ) | |
| | ) | |
| This Document relates to: | ) | Civil Action no.1:06-cv-00077 |
| 1:06-cv-00247-LO-TRJ | ) | |
| 1:06-cv-00265-LO-TRJ | ) | |
| 1:06-cv-00304-LO-TRJ | ) | |
| 1:07-cv-00296-LO-TRJ | ) | |
| 1:06-cv-01446-LO-TRJ | ) | |

## MEMORANDUM OPINION

This is a class action arising out of allegations of widespread accounting fraud perpetrated by the Mills Corporation and related entities, resulting in massive losses incurred by individual and institutional investors alike.

For the reasons that follow, the Court hereby APPROVES the Mills, Ernst & Young, and KanAm Settlements as fair, adequate, and reasonable under FED. R. CIV. P. 23(e)(2). Further, the Court APPROVES the Plan of Allocation as fair, adequate, and reasonable. The Court awards reasonable attorneys' fees in the amount of $36,495,000, or 18% of the total Settlement Fund and awards reasonable costs in the amount of $3,094,764.86 pursuant to FED. R. CIV. P. 23(h). Finally, the Court CERTIFIES as a Class for purposes of each of the Settlements those persons who purchased or acquired Mills common and preferred stock from February 27, 2001 through August 10, 2006, and retained securities through October 31, 2005, excluding certain persons and entities to be named in the Judgment and Order.

### I. Background and Procedural History

The Mills Corporation and related entities (collectively "Mills") operated as a Real Estate Investment Trust (REIT) that owned and developed shopping centers

throughout the United States and Europe. This case arises out of allegations of accounting fraud by Mills, Mills' senior officers and directors, the KanAm defendants,[1] and Mills' outside auditor, Ernst & Young.

From 2000 to 2005, Mills' public reports reflected the signs of a thriving company. Between 2000 and 2004, Mills' publicly-reported net income increased from $34.4 million to $232 million, and its "Funds From Operations" more than doubled, increasing from $105.3 million to $260.5 million. During this period of alleged over-reporting, Mills common stock rose from $26 per share to more than $63 per share, raising over $1.4 billion in capital from public and private stock offerings for Mills. For their part, Mills' officers and directors brought in more than $90 million in income via bonuses and sales of shares.

Beginning in late 2005, however, a different picture of Mills' financial health began to emerge. On October 31, 2005, Mills announced that its third quarter earnings would fall well short of expectations. On November 9, 2005, Mills issued a press release reporting declines in net operating income, FFO, and net income. Following this announcement, the prices of Mills common and preferred stock suffered considerable declines. Inconsistencies and errors in Mills' accounting became apparent, and twenty-three consecutive quarters of Mills' financial statements eventually needed to be reissued. Mills' net income for 2003, 2004, and 2005 was overstated by $210 million. Mills allegedly over-reported shareholders' equity by some $350 million and partners' capital by nearly $430 million. After the first partial disclosure in on November of 2005, further partial disclosures followed in January, February, March, and August of 2006.

---

[1] "KanAm Defendants" refers to collectively: KanAm Services, L.P., KanAm Management L.L.C., KanAm L.L.C., KanAm Providers, Inc., KanAm Realty, Inc., KanAm US, Inc., KanAm America, Inc., KanAm International GmbH, and KanAm Grund Kapitalanlagegesellschaft mbH.

Each of the disclosures had a marked impact on the value of Mills stock, causing a decline of 2.8% after the January disclosure, 3.6% after the February announcement, and 12.5% after the March disclosure. Most notably, after the final disclosure in August of 2006, the common stock declined over 26%. The first three 2006 disclosures equivocated a bit on the actual impact of the restatements. The August 10, 2006 disclosure, however, indicated that Mills would be filing a restatement that would reduce the Company's previously-reported net income for the years 2003 through 2005 by some $210 million and would reduce its shareholders' equity as of September 30, 2005 by $295 million. Further, the August disclosure also revealed that the budget of one of Mills' key projects, Meadowlands Mills, would be $800 million higher than what had been publicly projected.

On January 20, 2006, four class action complaints were filed in this Court against Mills, Mills LP, and certain executives and directors of Mills. On March 31, 2006, the Court ordered that these actions and all subsequently filed related actions be consolidated.[2] The Court then appointed Iowa Public Employees' Retirement System ("IPERS") and Public Employees' Retirement System of Mississippi ("MPERS") on June 1, 2006 as Lead Plaintiffs and approved their selection of Barrack Rodos and BLB&G as Lead Counsel.

On July 27, 2007, Lead Plaintiffs filed their Consolidated Class Action Complaint (the "Consolidated Complaint"), asserting claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"). The Consolidated Complaint asserts claims under the federal securities laws based on, *inter alia*, alleged misstatements and

---

[2]     Several additional class cases were filed and were also consolidated with the initial four cases.

3

omissions by Mills, their accountants Ernst &Young, and by Mills officers and directors.[3] These misrepresentations and omissions allegedly occurred in filings made by Mills with the Securities and Exchange Commission ("SEC") and communications with analysts and investors. The Consolidated Complaint represented a class of plaintiffs who purchased or otherwise acquired Mills publicly traded securities, including Mills common stock and preferred stock, from February 27, 2001 through August 10, 2006, and who retained securities through October 31, 2005, and who were damaged by these misrepresentations and omissions.

On September 13-14, 2007, Defendants filed separate motions to dismiss, which this Court granted in their entirety, allowing Lead Plaintiffs leave to re-plead by January 18, 2008. On January 18, 2008, Lead Plaintiffs filed an Consolidated Amended Class Action Complaint ("Amended Complaint"), again asserting claims under the Exchange Act and the Securities Act.

In response to the Amended Complaint, Defendants again filed motions to dismiss, but this Court denied those motions in their entirety on April 28, 2008. On May 9, 2008, Defendants filed their respective Answers to the Amended Complaint. Settlement talks then ensued between Lead Counsel and the three sets of defendants, which involved a series of discussions and mediation sessions before former Judge Weinstein. Eventually, on November 12, 2008, Lead Plaintiffs reached a $165 million settlement with Mills. Settlements with the other two groups of defendants, Ernst & Young and KanAm, took longer.

---

[3]     In addition to these defendants, "control person" claims were brought against the various KanAm entities.

4

Lead Plaintiffs filed a motion August 15, 2008 seeking: (i) to certify the Action as a class action, (ii) to certify Lead Plaintiffs and additional named plaintiffs C. Bickley Foster, Frederic Elliott and Vernon E. Rudolph as Class Representatives, and (iii) to certify Lead Counsel as Class Counsel. The Court granted that motion on March 31, 2009. In doing so, the Court also certified the following subclasses:

> (1) As against Defendant Ernst & Young, all persons who purchased or otherwise acquired Mills common and preferred stock, during the period from March 28, 2002 through August 10, 2006, and who were damaged thereby;
> (2) As against the KanAm Defendants, all persons who purchased or otherwise acquired Mills common and preferred stock, during the period from February 27, 2001 through August 10,2006, and who were damaged thereby."

Lead Plaintiffs had filed a motion to amend the Amended Complaint, substituting certain KanAm Defendants in place of the KanAm Defendants previously named in the Consolidated Complaint and Amended Complaint (the "Motion to Amend") on January 9, 2009, to which KanAm objected. On March 3, the Court entered an order denying the KanAm Defendants' motion to dismiss the Second Amended Complaint and the KanAm Defendants filed their Answer to the Second Amended Complaint on March 13. The same day, Ernst & Young and the KanAm Defendants filed Petitions for Permission to Appeal from this Court's ruling on the class certification motion in the Court of Appeals for the Fourth Circuit. On April 1, however, further discussions with Ernst & Young in mediation sessions before Judge Weinstein resulted in an agreement in principle in which Ernst & Young agreed to pay $29.75 million in settlement of the claims. Ernst & Young further agreed that it would seek deferral of proceedings in the Court of Appeals on its petition. Finally, after further discussions and another session before Judge Weinstein,

KanAm Defendants, the last remaining Defendants, reached a settlement agreement with Lead Plaintiffs for $8 million.

The Court entered a Notice Order on September 17, 2009 (the "Amended Notice Order"), which: mandated that notice be sent to the Class; set October 29, 2009 as the deadline for Class Members to submit objections to the Settlements, the Plan of Allocation or the Fee and Expense Application, or to request exclusion from the Class; and set a final approval hearing date of November 19, 2009.

On July 15, 2009, the Garden City Group ("GCG")– the entity authorized to act as the Claims Administrator in this action – sent out an initial 3,953 copies of the Notice and Claim Form (the "Claim Packet") by first-class mail and as of November 5, 2009, GCG had sent 128,602 Claim Packets. On September 21, 2009, in accordance with the Amended Notice Order, GCG published a Summary Notice in the national edition of *The Wall Street Journal* and over the PR Newswire.

The proposed settlement provides payment to the class in the form of a "common fund" from: (1) Mills in the amount of $165 million, plus interest; (2) Ernst & Young LLP in the amount of $29.75 million; and (3) the "KanAm Defendants" in the amount of $8 million. The specific terms of the settlement are numerous, but key is the plan of allocation, which provides:

> a. For each share of Mills common or preferred stock purchased or otherwise acquired during the Class Period that a Class member sold prior to November 1, 2005, the date on which Lead Plaintiff alleges Mills stock began to lose its artificial inflation, a Class member would have no recognized claim;
>
> b. For each share of Mills common or preferred stock purchased or otherwise acquired during the Class Period that a Class member sold between November 1, 2005, and August 11, 2006, the recognized loss amount would be the lesser of (1) the difference between the purchase price paid per share (excluding commissions) and the proceeds received on the sale per share (excluding commissions) OR (2) the difference between the estimated per share inflation in

6

the price of the particular share of Mills common or preferred stock on the purchase date (as represented in an attached appendix) and the estimated per share inflation in the price of the particular share of Mills common or preferred stock on the date of sale (as represented in an attached appendix);

c. For each share of Mills common or preferred stock purchased or otherwise acquired during the Class Period that a Class member sold from August 12, 2006, through November 8, 2006, the recognized loss amount would be the lesser of (1) the difference between the purchase price paid per share (excluding commissions) and the price per share for the particular share of Mills common and preferred stock on the sale date (as represented in an attached appendix) OR (2) the estimated per share inflation in the price of the particular share of Mills common or preferred stock on the purchase date (as represented in an attached appendix);

d. For each share of Mills common or preferred stock purchased or otherwise acquired during the Class Period that a Class member owned as of the close of trading on November 8, 2006, the recognized loss amount would be the lesser of (1) the difference between the purchase price paid per share (excluding commissions) and the 90-day lookback price per share ($17.19 for common shares; $21.63 for Series B preferred shares; $21.51 for Series C preferred shares; $21.05 for Series E preferred shares; $19.97 for Series G preferred shares) OR (2) the estimated per share inflation in the price of the particular share of Mills common or preferred stock on the purchase date (as represented in an attached appendix).

The Court heard arguments on the present motion and objections to the settlement, allocation, or fee and costs sought on November 19, 2009.

## I.    Legal Standard

In the Memorandum Opinion that follows, the Court addresses two issues: 1) the approval the proposed settlement between the parties and the proposed allocation thereof; and 2) the award of attorneys' fees and costs to Lead Counsel. Regarding the first issue, in this, like all class actions, FED. R. CIV. P. 23 (e) provides that no class action "shall ... be dismissed or compromised without the approval of the court." To that end, "[t]he approval of a proposed settlement agreement is in the sound discretion of the Court." *Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995)(citations omitted).

As to the second issue, an award of attorneys' fees under the Private Securities Litigation Reform Act ("PSLRA"), the Court has an "independent obligation to ensure the reasonableness of any fee request." *In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001)("*Microstrategy II*"). Specifically, the PSLRA provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u-4(a)(6). The PSLRA thus makes it incumbent upon this Court to carefully evaluate a request for fees, but does not set a specific method for doing so. *See Microstrategy II*, 172 F.Supp.2d at 785. Rather, like the approval of the Settlement, it is within the Court's discretion to set the award of attorneys' fees and costs at a reasonable amount. *See In re Sulzer Orthopedics Inc.*, 398 F.3d 778, 780 (6th Cir. 2005).

## II. Discussion

### A. The Settlement

Lead Plaintiffs, through Lead Counsel, ask this Court to approve the settlement entered into with each of the three groups of defendants in this class action (hereafter simply "the Settlement"). As noted above, under the Federal Rules of Civil Procedure, a class action cannot be settled, voluntarily dismissed, or compromised without the approval of the Court. *See* FED. R. CIV. P. 23(e). The central concern here is that "[i]f the proposed settlement is intended to preclude further litigation by absent persons, due process requires that their interests be adequately represented." *In re Jiffy Lube Securities Litigation*, 927 F.2d 155, 158 (4th Cir. 1991). For the reasons that follow, the Court finds

that the proposed Settlement meets the requirements of due process and FED. R. CIV. P. 23 and therefore approves the Settlement.

### a. Defendant Kenneth Parent's Objections

Before delving into the sufficiency of the Settlement, the Court briefly addresses the objections raised by Defendant Kenneth Parent ("Parent") to the proposed Mills Settlement.[4] In his Objection and Opposition, Parent asserts that this Court cannot grant final approval of the Mills Settlement because: (1) he (Parent) has not consented to be bound by the Settlement; and (2) the Settlement and proposed bar order violate the terms of the PSLRA by leaving open the possibility that Mills will seek contribution from him. Parent Opp. at 2. Both of Parent's grounds for objection prove unavailing. As noted by Lead Counsel at the November 19, 2009 hearing, Parent signed no stipulation, is not promising to do anything, and has not paid a penny towards the settlement. Nov. 9 Tr. at 14.

Specifically as to Parent's first point, the Court agrees with Lead Counsel that the issue is rendered moot by revisions made by the parties to the Proposed Judgment and Order. The relevant provision of the proposed Judgment now reads:

> Upon the Effective Date, each of the Mills Entities, on behalf of themselves and all other Released Parties (excluding Defendant Kenneth R. Parent and all persons or entities asserting rights on his behalf or obtained through him), their heirs, executors, administrators, predecessors, successors and assigns, and any other person claiming by, through or on behalf of them, shall be deemed by operation of law to have released, waived, discharged and dismissed each and every of the Mills Entities' Claims, and shall forever be enjoined from commencing, instituting or prosecuting any or all of the Mills Entities' Claims against any of the   Lead Plaintiffs, any other Class Members and Plaintiffs' Counsel.

---

[4]     Parent does not object to the KanAm or Ernst & Young Settlements.

9

In conjunction with an identical revision made to Paragraph 12.b of the Proposed Judgment, Parent will not release claims against Lead Plaintiffs, any Class Members or Plaintiffs' Counsel, nor is he is enjoined from pursuing any such claims.

As to Parent's second basis for objection, and echoing what this Court has already stated both by preliminarily by Order entered on June 3, 2009 and in open court at the hearing November 19, 2009, the settlement does not violate the PSLRA. At its heart, Parent's second objection hinges on whether he is properly deemed a party to the settlement or a "settlement covered person" within the meaning of the PSLRA. As provided in the PSLRA,

> A covered person who settles any private action at any time before final verdict or judgment shall be discharged from all claims for contribution brought by other persons. Upon entry of the settlement by the court, the court shall enter a bar order constituting the final discharge of all obligations to the plaintiff of the settling covered person arising out of the action. The order shall bar all future claims for contribution arising out of the action—
> (i) by any person against the settling covered person; and
> (ii) by the settling covered person against any person, *other than a person whose liability has been extinguished by the settlement of the settling covered person.*

15 U.S.C. § 78u-4(f)(7)(A)(emphasis added). In other words, the PSLRA allows the Court to enter an order barring claims against a "settling covered person" and by a "settling covered person," with the exception that the "settling covered person" can still bring a claim against a "person whose liability has been extinguished by the settlement." *Id.*

Parent argues that he qualifies as a "settling covered person" and thus Mills should be barred from seeking contribution against him. Lead Counsel counters that

10

rather than being a "settling covered person," Parent is more properly characterized as a "released party" against whom a "settling covered person" can still bring claims under 15 U.S.C. § 78u-4(f)(7)(A)(ii).

As a matter of clear statutory construction, it appears plain to the Court that § 78u-4(f)(7)(A)(ii) does provide a carve-out for "settling covered persons" to bring claims against those persons whose liability has otherwise been extinguished by the settlement. While counsel for Parent is correct in identifying an overarching goal of a settlement like this as securing "final peace," PSLRA does contemplate the possibility of further proceedings against those who might indemnify those parties which actually pay for that peace. Thus, because the "settlement agreement... extinguishes any potential liability [the complaining party] may have to plaintiffs... the Court holds that a settlement bar order is not required by the PSLRA." *In re Cendant Corp. Securities Litigation*, 2007 WL 2164241, at * 6 (D.N.J. July 5, 2007).

Having addressed the objections of Defendant Parent, the Court moves forward to address the sufficiency of the settlement under FED. R. CIV. P. 23(e)(2).

### b. The *Jiffy Lube* Test

In order for the Court to approve of any disposition of this suit by settlement, that proposed settlement must be "fair, adequate and reasonable to Class Members." FED. R. CIV. P. 23(e)(2). While this inquiry rests in "the sound discretion of the Court," the Court has the concomitant and overriding duty to ensure the "protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *Jiffy Lube Sec. Litig.*, 927 F.2d at 158.

The Fourth Circuit in *Jiffy Lube* provided district courts with a two-level analysis

applicable in evaluating a settlement's "fairness" and "adequacy." 927 F.2d at 158-59.

The relevant factors in assessing a settlement's "fairness" are: "(1) the posture of the case

at the time settlement was proposed; (2) the extent of discovery that had been conducted;

(3) the circumstances surrounding the negotiations; and (4) the experience of counsel in

the area of securities class action litigation." *Jiffy Lube*, 927 F.2d at 159. In turn, the

factors to be considered in assessing a settlement's "adequacy" are:

> (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any
> difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case
> goes to trial; (3) the anticipated duration and expenses of additional litigation; (4) the
> solvency of the defendants and the likelihood of recovery on a litigated judgment; and
> (5) the degree of opposition to the settlement.

*Id.* at 159. Each of the foregoing factors are met by the proposed Settlement at issue

here.

### i. Fairness

#### 1. The posture of the case at the time settlement was proposed weighs in favor of approval of the Settlement.

The first *Jiffy Lube* factor directs the Court to evaluate essentially how far the case

has come from its inception. *See, e.g., Muhammad v. Nat'l City Mortgage, Inc.*, 2008

U.S. Dist. LEXIS 103534, at *8 (S.D. W. Va. Dec. 19, 2008). If a case is still immature,

with a great deal of uncompleted discovery, the wariness of a reviewing court should be

elevated and attuned to "questions of possible collusion among the settling parties." *Jiffy

Lube*, 927 F.2d at 159. On the other hand, in cases in which discovery has been

substantial and several briefs have been filed and argued, courts should be inclined to

favor the legitimacy of a settlement. *In re MicroStrategy, Inc. Securities

Litigation("Microstrategy I")*, 148 F.Supp.2d 654, 664 (E.D.Va. 2001).

Even a cursory review of the docket sheet indicates the extent to which Class Counsel has developed this case. Lead Plaintiffs ultimately filed three complaints, overcoming motions to dismiss and pursuing the action through to class certification against three groups of sophisticated defendants over the course of three years. Class Counsel and Lead Plaintiffs had more than a sufficient opportunity to appreciate and develop the merits of their case. As discussed in greater detail in the next factor, Lead Plaintiffs conducted significant discovery, conducted depositions, and retained and developed the testimony of a damages expert. As such, this factor weighs in favor of approving the Settlement.

### ii. Extensive discovery that has been conducted in this case.

Like the first factor, the second factor – evaluating the extent of discovery that has been conducted – enables the Court to ensure that the case is well-enough developed for Class Counsel and Lead Plaintiffs alike to appreciate the full landscape of their case when agreeing to enter into this Settlement. Where, "[a]ll defendants had answered the complaint and all motions to dismiss had been ruled upon at the time of these settlements … [and] discovery was largely completed as to all issues and parties," the second factor militates toward approval of settlement. *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991).

This case proceeded through all of class discovery and nearly reached the conclusion of all fact discovery, which required a review of millions of pages of documents, a Fed. R. Civ. P. 30(b)(6) deposition and 25 fact witness depositions. As such, "[c]ounsel for both sides of this lawsuit participated in numerous meetings and extensive and intensive discussions extending over a period of months, with plaintiffs'

lead counsel pressing their belief in the strength of their case on the merits.

*MicroStrategy I*, 148 F.Supp.2d 654, 665 (E.D.Va. 2001). Developing a case to this extent "clarifie[s] plaintiffs' previous understanding of the strength and weaknesses of their claims and afford[s] plaintiffs the ability to confirm the fairness, reasonableness, and adequacy of the proposed partial settlement." *Id.* at 664. Thus, the second *Jiffy Lube* factor also leans in favor of approving the Settlement.

### iii. The circumstances surrounding the negotiations indicate that Lead Counsel are fully informed of all pertinent factual and legal issues in the case.

The third *Jiffy Lube* "fairness" factor requires the Court to evaluate the conditions and circumstances surrounding the settlement negations between Lead Counsel and each of the three sets of defendants. The objective of this factor is to ensure that "counsel entered into settlement negotiations on behalf of their clients after becoming fully informed of all pertinent factual and legal issues in the case." *Stone*, 749 F. Supp. at 1424. This requires an examination of "the negotiating process by which the settlement was reached" in order to ensure "that the compromise [is] the result of arm's-length negotiations …necessary to effective representation of the class's interests." *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982).

The settlement in this case is the product of a long series of dealings between Class Counsel and the three sets of defendants. Representatives for Lead Plaintiffs and for Mills participated in lengthy mediation sessions in April, July, and November of 2008 before Judge Weinstein prior to reaching an agreement in principle. Joint Decl. at ¶¶65-66. Likewise, representatives for Lead Plaintiffs and for Ernst & Young and KanAm also participated in several mediation sessions before Judge Weinstein before arriving at

agreements in principle with respect to each of those respective settlements. *Id.* ¶¶69-70.

It is apparent to the Court that this settlement was not entered into haphazardly with an underdeveloped understanding of the merits of the case. Rather, as the preceding factors demonstrate, the strengths and weaknesses of this case were well-developed for all parties, such that this factor also militates in favor of the Settlement. Negotiations were sufficiently thorough, contentious, and at arm's length to ensure the propriety of Class Counsel's decision to enter into the settlement and the proceedings leading thereto.

### iv. Lead Counsel have extensive experience in the area of securities class action litigation.

The final *Jiffy Lube* "fairness" factor looks to the experience of Class Counsel in this particular field of law. Indeed, this District has recognized that when Class Counsel are "nationally recognized members of the securities litigation bar," it is entirely warranted for this Court to pay heed to their judgment in approving, negotiating, and entering into a putative settlement. *Microstrategy I*, 148 F. Supp. 2d at 665.

In this case, Lead Counsel are highly experienced in the field of securities class action litigation. In their declarations to the Court, Lead Counsel describes with particularity the potential difficulties in proving this case to a fact-finder, particularly with the requisite showing in establishing a claim of fraud and establishing a causal tie between the inaccurate reporting and class members' losses from the decline in value of their stock. Lead Counsel's decision to settle the case is the product of thorough exploration and deliberation and as such, "their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight." *See Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000). Thus, the

fourth Jiffy Lube "fairness" factor is also met, indicating to the Court that this settlement is sufficiently "fair" under FED. R. CIV. P. 23.

### b. Adequacy

#### i. The relative strength of the plaintiffs' case on the merits and the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial;

Securities cases, like the present one, are "notably difficult and notoriously uncertain." *Stone*, 749 F. Supp. at 1426. This does not mean, however, that the Court should simply rubber-stamp a settlement merely because certain classes of cases are thought to be complex or difficult to prove. Rather, the first and second *Jiffy Lube* factors addressing the "adequacy" of a settlement compel the Court to examine how much the class sacrifices in settling a potentially strong case in light of how much the class gains in avoiding the uncertainty of a potentially difficult case.

Evaluating the force Plaintiffs' case is of the utmost importance because "[i]f the settlement offer was grossly inadequate... it can be inadequate only in light of the strength of the case presented by the plaintiffs." *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir. 1976)(citations omitted). Conversely, and as Lead Counsel rightly notes, "no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-744 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971). Such confidence may be especially misplaced in cases like the present, where "[e]lements such as scienter, materiality of misrepresentation and reliance by the class members often present significant barriers to recovery in securities fraud litigation." *Microstrategy I*, 148 F. Supp. 2d at 666.

Of course, the burden of proving these elements falls on the shoulders of the Class. This burden is only intensified given the separate groups of defendants and their

16

likely coordinate desire to point the finger towards one another. As Lead Counsel notes

in their brief, "[t]he Mills Defendants [would have] assert[ed] that they had relied on the

advice of E&Y, their outside auditor, and...E&Y [would have] argu[ed] that it had been

given incorrect and/or incomplete information by the Individual Defendants." Pl. Br. at

21-22. Further, the issue of damages would have likely been hotly contested, with

Defendants arguing that factors other than the misrepresentations and "false inflation"

caused the drop in stock value. As in *Microstrategy I*, "the damages issue would have

become a battle of experts at trial, with no guarantee of the outcome in the eyes of the

jury." 148 F. Supp.2d at 666-67.

In support of this uncertainty, particularly at the damages phase, Lead Counsel

cites to several cases in which substantial jury verdicts were later overturned. *See, e.g.,*

*Levinson v. Prentice-Hall, Inc.*, 868 F.2d 558, 564-65 (3d Cir. 1989); *Robbins v. Kroger*

*Props.*, 116 F.3d 1441 (11th Cir. 1997); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st

Cir. 1990). While the merits and relative strengths of those cases are perhaps

distinguishable from the one currently before the Court, Counsel's point is well taken,

and "[w]hen viewed against the substantial and certain benefits that a settlement would

provide, these considerations support approval of the proposed partial settlement." *In re*

*Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004).

### ii. The anticipated duration and expenses of additional litigation are extensive

The third *Jiffy Lube* "adequacy" factor asks the Court to weigh the settlement in

consideration of the substantial time and expense litigation of this sort would entail if a

settlement was not reached. This factor is based on a sound policy of conserving the

resources of the Court and the certainty that "unnecessary and unwarranted expenditure

of resources and time benefit[s] all parties." *In re Computron Software, Inc.*, 6 F.Supp.2d 313, 317 (D.N.J. 1998).

Perhaps the most telling evidence under this factor are the proceedings in this case to date. Lead Plaintiffs and Defendants have engaged in vigorous opposition over motions to dismiss, certify, and some of the defendants even proceeded with an appeal before the Fourth Circuit pursuant to Rule 23(f). It goes without much debate that any future proceedings leading up to, and including trial would be just as antagonistic and expensive, and lengthy post-trial motions likely would be filed. *See In re Gulf Oil/Cities Service Tender Offer Litigation*, 142 F.R.D. 588, 591 (S.D.N.Y. 1992); *Microstrategy I*, 148 F. Supp. 2d at 667 ("additional litigation of plaintiffs' claims ... would likely have been protracted and costly...[n]or is it likely that this litigation would have ended with a jury verdict; there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond...")

### iii. The solvency of the defendants and the likelihood of recovery on a litigated judgment.

While all cases carry the potential for uncertain verdicts, securities cases in particular are complex and difficult to prove. *See Stone I*, 749 F. Supp. at 1426 (citing *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973)). *Muhammad*, 2008 U.S. Dist. LEXIS 103534 at *13 (citation omitted). Thus, a settlement properly discounts the amount of recovery because of the risk inherent in going to trial and it would be inappropriate for this Court to require the parties to "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained" *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y.1972). Plaintiff also cites a number of cases for the proposition that even if successful at trial, plaintiffs' still face the

uncertainty on appeal. *See Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial); *Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478 (S.D.N.Y. 1970), *modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 363 (1973) (reversing $145 million judgment after years of appeals and on a theory that defendant had not raised, or argued). All of this uncertainty provides a necessary backdrop when also considering the solvency of the defendants in relation to the amount of the settlement.

That Mills experienced significant financial hardships during the pendency of this suit is hardly debatable. By late 2006, it was clear that Mills was incapable of operating as an independent company. This is evidenced by the acquisition of Mills in 2007 by Simon Property Group, Inc. and private equity firm Farallon Capital Management, L.L.C. (neither of which had a hand in any of the alleged fraud by Mills) for a significant amount less per share than Mills common stock traded during the proposed class period. Importantly, both Simon and Farallon declined to accept liability for Mills' acts. This rendered the Class incapable of any recovery beyond the limited assets of Mills. Taken together with this country's recent economic woes, particularly in the commercial real estate market, the full recovery from Mills' assets was less than a certainty. The same can be said for economic difficulties faced which would have likewise jeopardized the amount of recovery from the KanAm defendants.

As Lead Counsel notes, Ernst & Young, while not insolvent, would likey have been held accountable for only their own relatively low proportionate share of the harm incurred by the Class. *See* Joint Decl. at ¶61. This amount of recovery could have been

19

higher upon showing Ernst & Young acted intentionally, but the Court defers to Lead

Counsel's determination that such a recovery would have been highly difficult. Thus, the

amount of recovery from Mills, Ernst & Young, and the KanAm defendants is

appropriately discounted for potential solvency impediments and reflects the maxim that

"inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."

*Milstein*, 57 F.R.D. at 524-25.

### iv. The degree of opposition to the settlement.

The final *Jiffy Lube* "adequacy" factor looks to the reaction of the Class to the

proposed settlement and "[t]he attitude of the members of the Class, as expressed directly

or by failure to object, after notice to the settlement is a proper consideration for the trial

court." *Flinn*, 528 F.2d at 1173. Thus, an absence of objections and a small number of

opt-outs weighs significantly in favor of the settlement's adequacy. *See Microstrategy*,

148 F. Supp. 2d at 668.

A Notice of Pendency of Class Action, Proposed Settlements and Settlement

Fairness Hearing were mailed to over 128,000 potential Class members, and a Summary

Notice was published in *The Wall Street Journal* and issued over the *PR Newswire*. Joint

Decl. ¶¶6, 74-79; Pl. Ex. 1. After receiving the notices, not a single putative class

member objected to the settlements. Joint Decl. ¶¶8, 79.[5] This gives the Court a great

deal of confidence in the settlements adequacy, which is further bolstered by the paucity

of opt-outs from the Class. Class Counsel reports that only nine requests for exclusion

were received, and of those, only two came from Class Members who actually suffered a

loss from purchasing Mills stock during the Class Period. Pl. Br. at 29 n.4. This is a

---

[5]       John McAvoy, a Class Member who purchased Mills Series B preferred stock did file an
objection the proposed plan of *allocation*, but that objection fails for reasons discussed *infra*, § B.

staggeringly low number considering the one-hundred and twenty-eight thousand recipients of the notices.

As the last *Jiffy Lube* Factor is also satisfied by the Settlement, the Court has no hesitation in approving it as an adequate result on the behalf of the entire Class.

### c. Reasonableness

Finally, as this District has recognized, "there is a strong initial presumption that the compromise is fair and reasonable." *Microstrategy I*, 148 F. Supp.2d at 663. Upon review of the Settlement and after the hearing held before the Court on November 19, 2009, nothing has persuaded the Court to deviate from this initial presumption of reasonableness. In evaluating the reasonableness of the result reached, the Court recognizes that "after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995).

Class Counsel did not rush into the determination to settle, and over the course of three years, Lead Counsel engaged in negotiations in front of an experienced and capable mediator in this case. Pl. Br. 30-31. This case was highly contentious over a period of years, with numerous hotly-debated motions and in-depth discovery. In light of the foregoing, the court concludes that the Settlement "is consistent with the plaintiff's fiduciary obligations to the class" and is in all facets reasonable. *Jiffy Lube*, 927 F.2d at 158.

As such, the Court finds that that the proposed Settlement is fair, reasonable, and adequate under FED. R. CIV. P. 23. The Court now moves on to a review of the proposed plan of allocation between the parties.

## B. The Plan of Allocation

Like the analysis above of the Settlement, the plan of allocation must also meet the standards of fairness, reasonableness, and adequacy. *See MicroStrategy I*, 148 F.Supp.2d at 668; *see also In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir.1982). In evaluating a plan of allocation, the opinion of qualified counsel is entitled to significant respect. *See In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126, 133 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis. *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002). In this analysis, "as in its review of the settlement itself-the Court acts as the fiduciary of all Class Members." *PaineWebber*, 171 F.R.D. at 133.

Here, Stephen P. Feinstein, Ph.D., CFA, aided Class Counsel in creating a plan of allocation that specifically addresses the losses of those harmed by the alleged securities fraud. Pl. Ex. 2 at ¶¶2-4. Paramount in assigning recovery in a case of fraud like this is the notion that not every investor who lost money in a transaction involving Mills stock is necessarily eligible for recovery. The proposed allocation accounts for this by estimating the losses of the Class actually attributable to Defendants' supposed misstatements, and then restricts the amount of each Class Member's claim by the lesser of: (1) their actual amount of loss in purchasing and selling Mills stock, and (2) the difference between the amount by which the price per share was inflated when they purchased the stock versus the amount the price per share was inflated when they sold the stock.

This methodology results in payment to class members based on the actual misconduct of Defendants and not merely a blind payout to every individual who happened to lose money on the stocks. The plan of allocation also factors in the concept that fraud has a growing, non-uniform effect on the losses various members of the class incurred. Specifically, the Plan provides that:

a. For each share of Mills common or preferred stock purchased or otherwise acquired during the Class Period that a Class member sold prior to November 1, 2005, the date on which Lead Plaintiff alleges Mills stock began to lose its artificial inflation, a Class member would have no recognized claim;

b. For each share of Mills common or preferred stock purchased or otherwise acquired during the Class Period that a Class member sold between November 1, 2005, and August 11, 2006, the recognized loss amount would be the lesser of (1) the difference between the purchase price paid per share (excluding commissions) and the proceeds received on the sale per share (excluding commissions) OR (2) the difference between the estimated per share inflation in the price of the particular share of Mills common or preferred stock on the purchase date…and the estimated per share inflation in the price of the particular share of Mills common or preferred stock on the date of sale…;

c. For each share of Mills common or preferred stock purchased or otherwise acquired during the Class Period that a Class member sold from August 12, 2006, through November 8, 2006, the recognized loss amount would be the lesser of (1) the difference between the purchase price paid per share (excluding commissions) and the price per share for the particular share of Mills common and preferred stock on the sale date (as represented in an attached appendix) OR (2) the estimated per share inflation in the price of the particular share of Mills common or preferred stock on the purchase date…;

d. For each share of Mills common or preferred stock purchased or otherwise acquired during the Class Period that a Class member owned as of the close of trading on November 8, 2006, the recognized loss amount would be the lesser of (1) the difference between the purchase price paid per share (excluding commissions) and the 90-day lookback price per share ($17.19 for common shares; $21.63 for Series B preferred shares; $21.51 for Series C preferred shares; $21.05 for Series E preferred shares; $19.97 for Series G preferred shares) OR (2) the estimated per share inflation in the price of the particular share of Mills common or preferred stock on the purchase date (as represented in an attached appendix).

Notice ¶59. Thus, the planned allocation allows for " interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue." *MicroStrategy I*, 148 F. Supp. 2d at 669. This indicates to the Court that the planned allocation is fair, reasonable, and adequate.

### a. The Objections John McAvoy

A clearer picture of the logic of the proposed allocation emerges in analyzing the objection of John McAvoy, a Class Member who purchased Mills Series B preferred stock on August 23, 2004. McAvoy bought the stock for $27.30 per share and sold it on February 1, 2006, at $25.10 per share, indicating a loss of $2.20 per share over the period of time he owned Mills stock. Under the plan of allocation, however, McAvoy will receive no payment, which might seem unjust at first blush.

Upon closer inspection, however, the result is a logical one. When McAvoy purchased the stock on August 23, 2004, Lead Plaintiff's damages expert, Dr. Feinstein, calculates that the inflation per share to be $2.40. When he sold the stock, the inflation was actually estimated to be greater, at $2.93 per share. Thus, when the focus is placed on losses attributable to the actionable conduct of the Defendants – the fraud – the inflated value of McAvoy's shares actually increased by $.53 per share. Were the allocation structured to account only for out-of-pocket losses, the Class' recovery would be predicated, at least in part, on factors outside those serving as a basis for this suit.

Lead Plaintiffs direct the Court to a recent southern District of New York case, *In re AOL Time Warner, Inc. Sec & "ERISA" Litig.*, 2008 U.S. Dist. LEXIS 57544 (S.D.N.Y. July 30, 2008), in which that court analyzed a plan of allocation quite similar

to the plan in the present case. There, the court's concern was to ensure an accounting "in monetary terms, for fraud-related gains" and in doing so, rejected an objector's proposal which would "allow [the objector] to receive compensation for losses unrelated to that fraud." *Id.* at *19. That logic is equally applicable here. Accordingly, McAvoy's objection is denied.

As such, the Court believes there is easily a reasonable and rational basis for the proposed plan of allocation and the Court approves it as fair, reasonable and adequate.

### C. Attorneys' Fees and Costs

Having approved the Settlement and the proposed plan of allocation, the final consideration to be addressed by the Court is whether to grant Lead Counsel's request for attorneys' fees and reimbursement of expenses. Assuredly, Lead Counsel and Lead Plaintiffs are entitled to compensation and reimbursement for their efforts in ascertaining a benefit for the Class in this case. *See* FED. R. CIV. P. 23(h). What follows is the Court's analysis as to the proper amount of each.

#### a. Attorneys' Fees

As this District has already noted, one central factor in fixing the amount of attorneys' fees is "to ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task of representing a class in a securities fraud case." *In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001)("*Microstrategy II*"). Here, Lead Counsel provided a valuable service to the Class, and private securities actions like the present one work to provide a benefit beyond the confines of this particular Class. *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985).

The inquiry, then, moves to ascertaining the best method of calculating attorneys fees to appropriately compensate Class Counsel without unduly enriching them to the detriment of the Class. This question essentially boils down to two competing methods of calculation: the lodestar method and the "percentage of recovery" or ("percentage of the fund" method). *See Jones Jones v. Dominion Res. Servs.*, 601 F. Supp. 2d 756, 758 (S.D. W.Va. 2009). The lodestar method requires the multiplication of the number of hours worked by a reasonable hourly rate, the product of which the Court can then adjust by employing a "multiplier." *Id.* As it sounds, the percentage of fund method involves an award based on a percentage of the Class' recovery, set by the weighing of a number of factors by the court. *Id.*

While the Fourth Circuit has not definitively answered this debate, other districts within this Circuit, and the vast majority of courts in other jurisdictions consistently apply a percentage of the fund method for calculating attorneys' fees in common fund cases. *See, e.g., Jones v. Dominion Res. Servs.*, 601 F. Supp. 2d 756, 758 (S.D. W.Va. 2009); *Smith v. Krispy Kreme Doughnut Corp.*, U.S. Dist. LEXIS 2392, *3-4 (M.D.N.C. Jan. 10, 2007); *Microstrategy II*, 172 F. Supp. 2d at 787; *Strang et al. v. JHM Mortgage Sec. Ltd. P'ship et al.*, 890 F.Supp. 499, 502 (E.D.Va.1995).

### a. Applying the Percentage of Recovery Method, Attorneys' Fees of 18% are Reasonable

The Settlement approved above results in the formation of a "common fund" for the benefit of entire class, and thus, reasonable attorneys' fees may be awarded from this "common fund." *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). An attractive aspect of the percentage of recovery method is its results-driven nature which "ties the attorneys' award to the overall result achieved rather than the hours expended by the

26

attorneys." *Jones*, 601 F. Supp. 2d at 758. Of course, blindly awarding a requested percentage of the funds presents drawbacks of its own, namely what has been described as an "anchoring" effect, which might result in an inaccurately-high award even if the Court awards a smaller percentage than initially requested for fear of deviating too far. *See In re Cardinal Health Inc. Securities Litigations*, 528 F.Supp.2d 752, 763 (S.D.Ohio 2007).

Thus, "using the percentage of fund method and supplementing it with the lodestar cross-check... take[s] advantage of the benefits of both methods." *Id.* Further, as other courts have held, in a PSLRA case in which a fee request that has been approved and endorsed by properly-appointed lead plaintiffs, such as IPERS and MPERS here, enjoys a presumption of reasonableness. *In re Cendant Corp. Litig.*, 264 F.3d 201, 220, 282-83 (3d Cir. 2001) In determining the proper percentage of recovery, the Court will follow the lead of other district courts in this Circuit and apply the seven-factor approach derived from the Third Circuit. Those seven factors include: (1) the results obtained for the Class; (2) objections by members of the Class to the settlement terms and/or fees requested by counsel; (3) the quality, skill, and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) public policy; and (7) awards in similar cases. *See In re Cendant*, 243 F.3d at 733; *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir.2000); *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir.1974).[6]

---

[6]     These factors are substantially similar to the factors mandated in this Circuit when employing the lodestar method. *See Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir.1978)(the factors to be considered are: (1) time and labor expended; (2) novelty and difficulty of the questions raised; (3) skill required to properly perform the legal services; (4) attorney's opportunity costs in pressing the litigation; (5) customary fee for like work; (6) attorney's expectation at the outset of litigation; (7) time limitations imposed by the client or circumstances; (8) amount in controversy and results obtained; (9) experience, reputation and ability of the attorney; (10) undesirability of the case within the legal community in which

### a. Results Obtained for the Class

As mentioned above, a central advantage of the percentage of the fund method is that it looks to the results actually obtained by Lead Counsel rather than just the number of hours they expended, which should be an important point in awarding fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

Here, the $202.75 million total of the Settlement is very large in comparison to similar cases in this District and Circuit. And, as highlighted by Lead Counsel, the settlement is the result of a long series of motions litigation and mediation, with a series of Defendants who strenuously denied accountability for the Class' losses. The reaction of the Class thus far strongly indicates that the result achieved is a desirable one. The claims administrator has already received over ten thousand claim forms, despite the fact that the deadline for the submission of the forms is not until December 31, 2009, Joint Decl. ¶8.

### b. Objections

Further indicating the Class' approval of the result realized by this Settlement, of the one hundred twenty eight thousand potential class members, only two filed objections to the proposed fee and expense awards. One of these objectors was Mr. McAvoy, whose objections to the fee award follow from his principal objection to the plan of allocation. Because the Court already denied Mr. McAvoy's objection to the plan of allocation, it follows that his objection to the fee award on those grounds is likewise denied. *See* § II. A.

---

the suit arose; (11) nature and length of the professional relationship between the attorney and client; and (12) fee awards in similar cases). Because the lodestar is employed as a "cross-check" and because these factors are so similar to the seven factors analyzed within, each of the twelve *Barber* factors will not be laid out and analyzed separately.

The second objector is Dr. Daniel Rocker.[7]  Through counsel, Rocker argues that a "declining percentage" method should be used because of the sizable funds at issue in this case.  Lead Counsel responds that the entire notion of a "declining percentage" approach has been questioned since the decisions cited in his study. *See, e.g., In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig., 364 F. Supp. 2d 980, 998-99 (D. Minn. 2005)* ("There is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund.").  Rocker bases his argument in large measure on a study which indicates an average award of 15.1% percent in class actions resulting recoveries greater than $100 million.  Stuart J. Logan, Jack Moshman and Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 169 (2003).  However, and as Lead Counsel notes, that very study also shows that the average lodestar multiplier in those cases was 4.5, substantially higher than the applicable multiplier in this case, as will be seen, *infra. Id.*  Furthermore, basing an objection completely on a comparison of the size of the fund and percentage of the award in other cases discounts the specifics of each case – namely the amount of work done and the difficulty in that specific case of reaching a favorable result.

Another indication of the Class' endorsement of an award of 18% is that Lead Plaintiffs, IPERS and MPERS – sophisticated institutional investors – clearly approve of the percentage sought.  *See Cendant*, 264 F.3d at 282 (fee request "courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer

---

[7]     Dr. Rocker's brief also makes a procedural argument based on FED. R. CIV. P. 23(h)'s requirements pertaining to the notice given to Class members of Class Counsel's request for fees.  After reading Dr. Rocker's brief and hearing arguments on the matter at the November 19, 2009 hearing, the Court is confident that the Notice provided complies with Rule 23(h) and is in line with common practice with similar cases in other jurisdictions.

agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel").

On the other hand, and without belaboring the issue, the Court is aware that counsel for Dr. Rocker is no stranger to objecting to fee awards in class actions. *See, e.g.,* *In re UnitedHealth Group PSLRA Litig.*, 643 F. Supp. 2d 1107 (D. Minn. 2009). Though this Court assigns no prejudice to Dr. Rocker's objection on this basis, the Court would note that the opinion of those actually involved with the case in detail carries more credibility than an objection filed by an attorney that fails to reference any of the facts specific to this case. Though Dr. Rocker's brief correctly points out that the "declining percentage" method has been used in so-called "megafund" cases, that observation does little to influence the reasonableness of the award here.

Thus, while not dispositive, the dearth of legitimate objections to the requested fee of 18% enforces the reasonableness of that request in the Court's eyes. *See, e.g., In re* *Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (affirming fee award and stating that district court "did not abuse its discretion in finding the absence of substantial objections by class members to the fee requests weighed in favor of approving the fee request").

### c. Quality, Skill, and Efficiency of the Attorneys Involved

The Court has found Lead Counsel to be very experienced and skilled in the field of securities litigation and achieved here a very favorable result for the Class. Joint Decl. ¶¶90-92. Lead Counsel conducted extensive discovery related to class certification, including preparing two expert reports and taking the depositions of Defendants' experts, and successfully obtained certification of the Class. Joint Decl., ¶¶5(e), 42-50). Lead

Counsel also conducted extensive fact discovery, including a review of over four millions of pages of documents and deposing numerous witnesses. *Id.* ¶¶5(f), 36-41. Counsel further engaged in extensive successful motion practice and reached a favorable Settlement after numerous mediation sessions with a knowledgeable and sophisticated retired judge against experienced and sophisticated defense attorneys. *Id.* ¶¶5, 64-65. *See In Re Warner Commc'ns Sec. Litig.,* 618 F.Supp. 735, 749 (S.D.N.Y.1985) (quality of opposing counsel is a factor to be considered in evaluating Lead Counsel's performance). Further indicating Counsel's skill and efficiency, all of the above was done within once year of the Court's denial of Defendant's Motion to Dismiss.

### d. The Complexity and Duration of the Litigation

As the number of potential class members and the size of the settlement indicate, this case was highly complex, playing out over the course of several years. The very nature of a securities fraud case demands a difficult level of proof to establish liability. Elements such as scienter, reliance, and materiality of misrepresentation are notoriously difficult to establish. *In re GNC Shareholder Litig.,* 668 F. Supp. 450, 451 (W.D. Pa. 1987). Proving damages further implicated complex economic modeling at the hands of sophisticated experts, who, in order to ascertain the fluid and shifting effects of alleged widespread fraudulent reporting, necessarily engaged in complex measurements of stock valuation and price movement. Expert and consultant fees alone totaled more than $1,831,000. All told, Lead Counsel reports some 68,000 hours of attorney and other professional time spent accomplishing the above, certainly to the exclusion of other professional opportunities. Joint Decl. ¶¶90-92.

Of course, Lead Counsel did not actually have to litigate a number of the above-mentioned difficult issues through trial, which might mitigate the amount of an award to which Lead Counsel is entitled. *Jones*, 601 F.Supp.2d at 762. However, the correlating time and money saved in reaching a settlement before resorting to trial compensates for this. As such, this factor weighs in favor of the requested fee award.

### e. The Risk of Nonpayment and Public Policy

The risk of nonpayment incurred by Lead Counsel is evident in the fact that they undertook this action on an entirely contingent fee basis. Indeed, "counsel bore a substantial risk of nonpayment…. [t]he outcome of the case was hardly a foregone conclusion, but nonetheless counsel accepted representation of the plaintiff and the class on a contingent fee basis, fronting the costs of litigation." *Muhammad*, 2008 U.S. Dist. LEXIS 103534 at *22-23. As noted above, recovery in this case was anything but certain for the Class, as Defendants rigorously contested their liability from the outset of this case. Nonetheless, Lead Counsel devoted thousands of hours on the case and fronted nearly $3 million in costs in the process. As such, this factor also weighs in favor of awarding the fee requested by Lead Counsel.

Additionally, the risk of nonpayment naturally dovetails with the next factor, public policy. The public benefits when capable and seasoned counsel undertake private action to enforce the securities laws. *See Microstrategy II*, 172 F. Supp. 2d at 787-88. The cost and difficulty in doing so naturally stands as a deterrent from doing so, and one object of an award of attorneys' fees should be to counteract this deterrence and incentivize competent attorneys to pursue these cases when necessary.

However, this desire to provide incentives to lawyers pursuing worthwhile cases is circumscribed to a degree by the "perception among a significant part of the non-lawyer population and even among lawyers and judges that the risk premium is too high in class action cases and that class action plaintiffs' lawyers are overcompensated..." *Jones*, 601 F.Supp.2d at 764 (citing the Third Circuit Task Force Report, *Selection of Class Counsel*, 208 F.R.D. 340, 355 (January 15, 2002)). This concern is not a trivial one and requires attentiveness by this Court in awarding fees. In the end, however, the PLSRA's direction that an award of attorneys' fees "must include an incentive component to ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task of representing a class in a securities fraud case" compels this Court to find that public policy favors the requested fee here given Counsel's efforts for this Class. *Microstrategy II*, 172 F.Supp.2d at 788.

### f. Awards in Similar Cases

Finally, the Court looks to fee awards in analogous cases to determine the reasonableness of the percentage requested here. While the Court notes above that merely comparing the size of the fund and percentage of the award in other cases to the present case discounts the specifics of each case, it nonetheless provides a valuable point of reference. Still, the reasonableness inquiry is necessarily case-specific, and thus the percentage actually awarded varies from case to case. *See Braun v. Culp, Inc.*, 1985 U.S. Dist. LEXIS 20373, at *7(M.D.N.C. Apr. 26, 1985)("in matters in which fees are contingent upon recovery, the fee is sometimes expressed as a percentage of the recovery and ranges from 25% to 40%). Though varied, it is worth noting as a starting point that

percentage awards are "often between 25% and 30% of the fund." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 at 188.

As indicated in the chart that follows, numerous courts within the Fourth Circuit in addition to courts outside this Circuit have recently awarded fees in excess of the requested percentage here:

| Case | Approx. Size of Fund/Recovery | Percentage Awarded |
|---|---|---|
| *Microstrategy II* (E.D. Va. 2001) | $152,500,000-$192,500,000 | 18% |
| *Jones* (S.D. W.Va. 2009) | $40,000,000-50,000,000 | 20% |
| *Muhammad* (S.D. W. Va. 2008) | $700,000 | 33.3% |
| *In re SPX Corp. ERISA Litig.* (W.D.N.C. 2007) | $3,600,000 | 28% |
| Smith v. Krispy Kreme Doughnut Corp., (M.D.N.C. Jan. 10, 2007) | $4,750,000 | 26% |
| *Mason v. Abbot Labs.,* (N.D. W. Va. 2001) | $1,705,200 | 25% |
| *Braun v. Culp, Inc.,* (M.D.N.C. 1985) | $1,500,000 | %25 |
| *In re Rite Aid Corp. Sec. Litig.* (E.D. Pa. 2005) | $126,641,315 | 25% |
| *In re Deutsche Telekom AG Sec. Litig.,* (S.D.N.Y. 2005) | $120,000,000 | 28% |
| *In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.* (D. Minn. 2005) | $80,000,000 | 25% |
| *In re Freddie Mac Sec. Litig.,* (S.D.N.Y. Oct. 27, 2006) | $410,000,000 | 20% |
| *In re Sunbeam Sec. Litig.,* (S.D. Fla. 2001) | $110,000,000 | 25% |
| *In re Bankamerica Corp. Sec. Litig.,* (E.D. Mo. 2002) | $490,000,000 | 18% |
| *In re DaimlerChrysler A.G. Sec. Litig.,* (D. Del. 2004) | $300,000,000 | 22.5% |
| *In re Rite Aid Corp. Sec. Litig.,* (E.D. Pa. 2001) | $193,000,000 | 25% |
| *In re 3Com Corp. Sec. Litig.,* (N.D. Cal. 2001) | $259,000,000 | 18% |
| *In re IKON Office Solutions, Inc.,* (E.D. Pa. 2000) | $111,000,000 | 30% |

Thus, an award of 18% falls within the range of awards in recent similar cases.

The propriety of this percentage is further bolstered by the use of a lodestar crosscheck,

which indicates that an award of 18% is actually on the low end of the spectrum when considered together with the amount of work actually performed in this case.

### g.  Lodestar Cross-Check

When using lodestar method as a "cross-check," the Court needs not apply the "exhaustive scrutiny" typically mandated, and the Court may accept the hours estimates provided by Lead Counsel. *Jones*, 601 F.Supp.2d 765 -766.  To apply the lodestar method, the Court determines the attorneys' fees award by multiplying the number of hours reasonably worked by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer. *See In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 132 (D.N.J. 2002). Here, class counsel spent an aggregate of 68,255 hours prosecuting this Action, with over 62,000 of those hours attributable to Lead Counsel alone. Joint Decl. ¶¶91, 95.[8] One point of contention raised by the Objector Dr. Rocker in relation to the number of hours included in this equation was whether the hours of contract attorneys should be included.  After review, and as stated in open court, the Court has absolutely no trouble finding that the contract attorneys should be billed at market versus cost. They are part of the team brought in to benefit the class. Their contributions are of a similar nature to the attorneys who are in the firms retained by plaintiffs, and they should be compensated in that manner.  November 19, 2009 Tr. at 45, 46.

Lead Counsel submitted extensive documentation of the hours worked by each firm representing the Class and also the hourly rate billed by each attorney or professional support staff. *See* Pl. Exs. 7A- G.  Multiplying those hours times their

---

[8]     The 68,255 hours figure includes the work expended by other plaintiffs firms working under the supervision of Lead Counsel.

relevant hourly rates, which works out to approximately $402 an hour, results in fees of

$27,506,457.00. The requested fee of 18% equates to $36,495,000, which is

approximately a 1.3 lodestar multiplier. For clarity, Lead Counsel offers the following

chart,[9] delineating hours expended and costs incurred:

| TAB | FIRM | HOURS | LODESTAR | EXPENSES |
|-----|------|-------|----------|----------|
| 7A | Bernstein Litowitz Berger & Grossmann LLP | 31,815.10 | $12,470,416.00 | $625,112.71 |
| 7B | Barrack Rodos & Bacine | 30,283.25 | $12,443,987.50 | $525,129.42 |
| 7C | Ann D. White Law Offices | 743.00 | $232,850.00 | $170.26 |
| 7D | Cohen Milstein Sellers & Toll PLLC | 2,425.00 | $1,178,993.75 | $24,014.43 |
| 7E | Finkelstein Thompson LLP | 765.58 | $297,021.00 | $53,817.88 |
| 7F | Murray, Frank & Sailer LLP | 468.70 | $199,620.00 | ---------- |
| 7G | Saxena White P.A. | 1,754.50 | $683,568.75 | $20,888.95 |
| | | | | |
| | **TOTAL:** | **68,255.13** | **$27,506,457.00** | **$1,249,133.65** |

Given that courts "have generally held that lodestar multipliers falling between 2

and 4.5 demonstrate a reasonable attorneys' fee," the 1.3 multiplier suggested here is

reasonable. *Jones*, 601 F.Supp.2d at 766. Accordingly, the Court finds a percentage

award of 18% in this case to be perfectly reasonable and merited by a job well done by

Lead Counsel in a difficult case.

## III.    Costs

In addition to the fees awarded above, Lead Counsel also request reimbursement

of $3,094,764.86 in litigation costs and expenses. Joint Decl. ¶¶87, 95, 106, 108, and

Exhibit 8.   The Court is authorized to award costs that are "reasonable in nature ... from

the common fund" *Microstrategy II*, 172 F. Supp. 2d at 791.  The costs sought by Lead

counsel to be reimbursed include expert fees, reproduction costs, mediation costs, and

court costs. Joint Decl. ¶¶106-119. The Class representatives incurred these costs in

---

[9]      The expenses indicated do not include an outstanding $1,845,631.21 in costs.  Thus, Plaintiffs total costs amount to $3,094,764.86.

connection with, among other things, traveling to depositions, the review of documents provided by class counsel, and attendance at mediation sessions and/or court hearings. *Id.* Lead Plaintiffs also seek reimbursement for their costs directly relating to their representation of the Class in the amount of $42,419.50. Joint Decl. ¶118.

Simply put, the Court does not find that any of the expenses that were incurred are outside of the realm of those expected or previously approved by other courts, including in this District. *See Microstrategy II*, 172 F. Supp. 2d at 791. Further, given that the Class representatives incurred the costs for which they seek reimbursement engaging in activities such as traveling to depositions, reviewing documents provided by class counsel, and attending mediation sessions and court hearings, the Court approves reimbursement of those expenses as reasonable. *Id.*

Thus, the Court awards costs in the amount of $3,094,764.86 to be paid from the common fund.

## IV. Class Certification for Settlement

As Lead Plaintiffs jointly seek certification of a Settlement Class consisting of persons who purchased or acquired Mills common and preferred stock from February 27, 2001 through August 10, 2006, and held their stock at least through October 31, 2005 if purchased before that date. The Court preliminarily certified this for settlement purposes by Order entered on March 5, 2009 with respect to the Mills Settlement and the Order entered on June 22, 2009 with respect to the E&Y and KanAm Settlements.

As Lead counsel notes, certification for settlement "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants." *In re Prudential Sec. Inc. Ltd. P'ships*

*Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995); *see also Stone I*, 749 F. Supp. at 1428-29 (certifying settlement class).

Accordingly, pursuant to FED. R. CIV. P. 23(a) & (b)(3), the Court certifies as a Class for purposes of each of the Settlements those persons who purchased or acquired Mills common and preferred stock from February 27, 2001 through August 10, 2006, and retained securities through October 31, 2005, excluding certain persons and entities to be named in the Judgment and Order.

### V.    Conclusion

In light of the foregoing, the Court hereby APPROVES the Mills, Ernst & Young, and KanAm Settlements as fair, adequate, and reasonable under FED. R. CIV. P. 23(e)(2). Further, the Court APPROVES the Plan of Allocation as fair, adequate, and reasonable. The Court awards reasonable attorneys' fees in the amount of $36,495,000, or 18% of the total Settlement Fund, and awards reasonable costs in the amount of $3,094,764.86 to Lead Counsel and $42,419.50 to Lead Plaintiffs. Finally, the Court CERTIFIES as a Class for purposes of each of the Settlements those persons who purchased or acquired Mills common and preferred stock from February 27, 2001 through August 10, 2006, and retained securities through October 31, 2005, excluding certain persons and entities to be named in the Judgment and Order.

Appropriate Orders shall issue.


Alexandria, Virginia
December 23, 2009

/s/
Liam O'Grady
United States District Judge

38